UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHELLE GEIGEL, as administrator ) <br> of the estate of CRISTHIAN GEIGEL, ) <br>     Plaintiff, ) <br> v. ) <br> ) <br> BOSTON POLICE DEPARTMENT, ) <br> ISMAEL ALMEIDA, and ) <br> JOHN/JANE DOES NOS. 1–2 ) <br>     Defendant. ) <br> ) | CIVIL ACTION NO. 1:22-CV-11437 |

**COMPLAINT**

1. This Complaint is against the Boston Police Department ("BPD") for the wrongful death of Cristhian Geigel. Cristhian was a beloved father, son, brother, and friend. Yet he died alone in a cell in the BPD District 4 station on May 28, 2019, from a preventable opioid overdose. He was in the custody of the BPD and depended on the BPD for healthcare. Cristhian had displayed obvious signs of urgent medical distress for hours, and any reasonable person would have understood that he required immediate medical attention. But the officers who could have saved Cristhian's life failed to obtain a medical evaluation, seek outside medical treatment, or provide him with medical care themselves, causing his death.

2. On May 27, 2022, the BPD arrested Cristhian Geigel and booked him into the District 4 station. BPD placed Cristhian in cell 16 which was monitored by surveillance cameras. Cristhian had lived with OUD for years. He had survived previous opioid overdoses but he did not survive the District 4 station.

3. The Boston Police Department's policy, practice, and custom was to lock arrestees, even those known to be drug users, alone in cells without having them evaluated by a medical provider and without properly monitoring them for, or responding to, signs of overdose.

4. This policy, practice, and custom was reflected in the BPD's written rules & procedures, the BPD's failure to properly train its officers how to recognize or treat signs and symptoms of opioid intoxication and overdose, and the BPD's failure to supervise, investigate, and discipline officers who violated the right of people living with an addiction or opioid use disorder to receive reasonable and adequate medical care after arrest.

5. At least in part because of the BPD's policy, practice, custom, including its policy, practice, and custom of failing to train or supervise, investigate, and discipline its staff, BPD officers were acclimated to disregarding the medical distress of people they regarded as using drugs; in consequence, BPD officers behaved objectively unreasonably and deliberately indifferently toward, and intentionally discriminated against, such people because of their disease.

6. Indeed, at all times relevant to this complaint, BPD officers intentionally discriminated against those living with an addiction or opioid use disorder because of their disease. As a result, BPD officers failed to provide those living with OUD with adequate medical care even in the face of clear signs that these people were in a state of medical distress that any reasonable person would have understood required medical attention.

7. Cristhian's death was caused by the BPD and its employees. During booking, despite clear signs that Cristhian was an addict, suffering from opioid use disorder, and had recently ingested illegal narcotics, BPD officers failed to seek a medical evaluation, obtain outside medical treatment, or provide medical care themselves. After locking Cristhian in a cell, video

surveillance demonstrated that he ingested drugs, BPD officers failed to seek a medical evaluation, obtain outside medical treatment, provide medical care themselves, or otherwise intervene. And when Cristhian subsequently displayed clear symptoms of overdose in his cell, BPD officers failed to seek a medical evaluation, obtain outside medical treatment, or provide medical care themselves. These signs of overdose included remaining for hours in a prone position, without moving.

14. Any reasonable person would have understood that Cristhian's symptoms made clear that he required immediate medical attention. Despite the clear signs and their obligation to protect him, BPD officers walked by Cristhian's cell several times over the course of hours—when Cristhian had been in that exact same position—without providing any help.

15. Cristhian was just 39 years old. He left behind a grieving community of family and friends.

16. Defendant's failure to obtain a medical evaluation, seek outside medical treatment, or provide medical care themselves despite Cristhian's obvious signs of urgent medical distress was objectively unreasonable towards, and deliberately indifferent to, a serious medical need in violation of his due process rights under the Fourteenth Amendment. Defendant's failures also demonstrated unlawful discrimination on the basis of Cristhian's opioid use disorder in violation of the Americans with Disabilities Act ("ADA"). Cristhian's estate seeks damages under 42 U.S.C. § 1983, Mass. Gen. Laws ch. 229, § 2, and the ADA.

**PARTIES**

17. Plaintiffs Michelle Geigel is Cristhian's daughter and administrator of the estate of Cristhian Geigel representing the interests of Cristian Geigel's estate. Michelle and her brother Cristhian are the sole heirs to Cristhian's estate.

18. Defendant BPD is a component of the City of Boston, a Massachusetts municipality. The BPD's headquarters are at One Schroeder Plaza, Roxbury Crossing, MA 02120. The BPD operates the lockup at the District 4 station, which is located at 650 Harrison Ave, Boston, MA 02118.

19. Defendant Ismael Almeida was at all relevant times an officer in the BPD. His actions alleged in this complaint were taken under the color of laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

20. John/Jane Does Nos. 1–2 are employees of the BPD who are not yet identified, who were at all relevant times officers in the BPD. Their actions alleged in this complaint were taken under the color of laws of the Commonwealth of Massachusetts and the City of Boston. They are sued in their individual capacities.

**JURISDICTION AND VENUE**

21. Jurisdiction is proper under 28 U.S.C. §§ 1331, 1343, and 1367. Venue is proper under 28 U.S.C. § 1391.

**ALLEGATIONS**

Cristhian Geigel was a caring father, loving partner, and faithful friend.

22. Cristhian was born in Massachusetts.

23. Cristhian was a playful and warm person who was generous and kind. Cristhian and his children Michelle and Cristhian enjoyed an unfaltering, loving bond. Cristhian also so loved the members of his extended family.

24. Cristhian was also one of millions of people in this country who became addicted to opioids. Cristhian began using opioids in high school, and experienced years of cycling between periods

of active addiction and recovery. This experience is typical for those with OUD, which, like other chronic diseases, has stages of remission and activation.

25. Cristhian utilized harm reduction practices because he wanted to live: he was prescribed medicine that would block the effects of illegal drugs.

26. At all relevant times, BPD required its officers to regularly walk by the cells of people held in custody after arrest, dictating that the Duty Supervisor must "visit, or cause to be visited, all persons in their custody at least once every fifteen minutes," and "ensure that each visit is recorded in the Prisoner Inspection Record."  (BPD Rules and Procedures, Rule 318, § 14.)

27. However, BPD rules and procedures did not require the officers to look in the cells during these visits, record what they observed during a visit, or do anything as a result of these visits to protect the life and health of people living with OUD who were held in custody after arrest.

28. Specifically, BPD's rules and procedures did not require officers to look into a cell during these visits. It did not require officers to obtain a medical evaluation or transport people held in their custody after arrest to a hospital if they were demonstrating signs of opioid intoxication during booking. It did not require officers to seek outside medical treatment or provide medical care themselves to people held in their custody after arrest when they were exhibiting signs of opioid intoxication or overdose during their detention. And it did not require officers to implement protocols to prevent people held in their custody after arrest from overdosing.

29. This stood in stark contrast to BPD's rules and procedures regarding the treatment of non-OUD medical matters in people held in their custody after arrest.

30. Specifically, BPD mandate for "visible injuries" required that when a detained person was "found to be suffering from wounds or injuries requiring medical attention," officers must summon medical attention and must transport the detained person to the hospital if so advised. (BPD Rules and Procedures, Rule 318, §2.) The mandate for "sickness or injuries" extended to requiring a hospital transport prior to booking for "seriously injured prisoners"; noted that "[a]ny unusual appearance or behavior displayed by a prisoner shall receive immediate attention"; and stated "when a prisoner is unconscious, the Duty Supervisor shall be notified, every effort shall be made to restore consciousness and medical assistance shall be summoned." (BPD Rules and Procedures, Rule 318, §3.)

31. Under these rules, BPD officers were required to procure medical attention for a detained person with a medical condition like a broken leg, an open wound, or a concussion. Yet no such rule directed BPD officers to take action when people were experiencing opioid intoxication or overdose—even though those conditions, like wounds or injuries or sickness, require medical attention.

32. BPD also mandated specific protocols that were triggered "whenever, in the opinion of the Duty Supervisor or the person in charge of any police facility, a prisoner shows indications that he may attempt to commit suicide (e.g., extreme depression, anxiety)." (BPD Rules and Procedures, Rule 318, § 15.)  The policies dictated that officers shall take "all reasonable precautions to prevent such an attempt," including ensuring "that the prisoner is closely monitored," dispatching "appropriate medical personnel" to the station to conduct a medical evaluation, and if such personnel are unavailable, transporting the prisoner to the hospital for such an evaluation.  (BPD Rules and Procedures, Rule 318, § 15).

33. No such protocols existed regarding the prevention of opioid overdose for people showing signs of drug intoxication, even though such people similarly require close monitoring to avoid deadly consequences.

34. BPD was aware of the importance of providing medical care to individuals who were intoxicated with opioids. Indeed, its policy mandated that those brought into protective custody under the Massachusetts Alcoholism Treatment and Rehabilitation Law "shall be transported to a hospital or medical facility" "[i]n instances where the incapacitation is due to drugs." (BPD Rules and Procedures, Rule 318A.)

35. Critically, however, no such rule existed for people held in BPD custody after arrest. BPD took custody of Cristhian in an area known as the epicenter of the opioid epidemic

36. Cristhian lost his life, and his family lost their loving son and caring father, as a result of the Defendant's unconstitutional and unlawful behavior and the BPD's policy, practice, and custom, including its policy, practice, and custom of failing to train, supervise, investigate, or discipline their officers.

37. On information and belief, at least one of the officers who participated in Cristhian's arrest was aware that he had a history of opioid use.

38. The dangerous effects of an opioid on the human body can become greater over a period of many hours.

39. Throughout booking, Cristhian showed obvious signs of opioid over-intoxication, but Defendant BPD failed to seek a medical evaluation, obtain medical treatment, or provide medical care.

40. Although the officers had access to Narcan the entire time that Cristhian was at District 4, no officer attempted to administer Narcan.

41. There was a point at which Narcan could have saved Cristhian's life. But by the time the BPD intervened, it was too late to successfully reverse Cristhian's overdose. His heart had stopped beating.

42. Cristhian's family was devasted by his death and has experienced severe emotional distress as a result of his loss.

43. Cristhian's family was denied a chance to say goodbye to their beloved Cristhian.

44. Michelle and Cristhian think about Cristhian every day. Every day they despair over losing him. His death has taken everything from them.

45. Cristhian remained in BPD custody until he died. BPD held Cristhian as a pretrial detainee. He was not being held under a criminal conviction and was not serving a criminal sentence.

46. While Cristhian was in BPD custody, any reasonable person would have understood that he had serious medical needs given his symptoms. Cristhian's failure to move one inch for hours was clear evidence that something was desperately wrong.

47. Cristhian's need for medical attention was especially obvious given that at least one of the officers on duty at District 4 during his detention knew that Cristhian had a history of opioid use and appeared to have ingested opioids sometime before his arrest; and Cristhian visibly continued to ingest opioids while he was detained.

48. BPD officers knew or should have known of, and acted in a manner that was objectively unreasonable towards, and deliberately indifferent to, the serious risk to Cristhian's health and safety by taking him to a cell without first providing a medical evaluation, and then leaving him

alone in that cell without seeking outside medical treatment or providing medical care themselves. Although these officers observed obvious signs that Cristhian was under the influence of opioids and at high risk of an overdose, they did not request a medical evaluation for Cristhian, provide medical care to Cristhian, adequately monitor Cristhian to ensure his health and safety, administer Narcan to Cristhian when it was evident that Cristhian was exhibiting signs of opioid overdose, call an ambulance for Cristhian, or otherwise seek outside medical treatment for Cristhian until he had already stopped breathing. Instead, Defendant BPD officers consciously and unreasonably failed to provide Cristhian with medical care of any kind while he was in their custody.

50. Had the BPD officers provided Cristhian with an adequate medical evaluation after his booking, he would have been subject to close and careful monitoring. Such monitoring is part of the standard of care for highly intoxicated individuals out of both a concern that the dangerous effects of an opioid on the human body can become greater over many hours and a concern that such individuals are more likely to engage in conduct that may harm themselves or others. Had Cristhian been provided an adequate medical evaluation, he would not have died.

51. Had the officers sought outside medical treatment for Cristhian or provided Cristhian with adequate medical care themselves, including but not limited to repositioning Cristhian's body, attempting to rouse him, calling 911, and/or administering the medication Narcan earlier, Cristhian would not have died.

52. If diagnosed and treated at an appropriate time, opioid overdose is reversible. When administered in time, Narcan saves lives. According to the Massachusetts Bureau of Substance

Abuse Services: "Giving [Narcan] to someone who has overdosed restores normal breathing, by reversing the effects of opioids. It is safe, easy to administer, and has no potential for abuse."

53. Had Cristhian received appropriate medical care while in BPD custody, he also would have survived on July 14, 2019. If the Defendant Officers had sought outside medical treatment or provided medical care themselves earlier, the Narcan would have been effective, and Cristhian would not have died that day.

54. Defendant's deliberate, intentional, and unreasonable failure to seek a medical evaluation for Cristhian, obtain outside medical treatment for Cristhian, or provide Cristhian medical care themselves caused Cristhian's death. BPD's policies, practices, customs, including its policy, practice, and custom of failing to train, supervise, investigate or discipline their officers, caused the Defendant Officers to deny Cristhian's constitutional right to medical care

55. The BPD's policies, practices, customs, were the moving force behind the violations of Cristhian's constitutional rights by the Defendant.

56. As described above, BPD's rules and procedures required officers to seek a medical evaluation, obtain outside medical treatment, or provide medical care themselves when incarcerated people displayed signs of non-OUD-related medical needs, but failed to include such requirement for people displaying signs and symptoms of opioid intoxication or overdose after an arrest.

57. BPD had no directives, Special Orders, Commissioner's Memoranda, or Training Bulletins in place at the time of Cristhian's death regarding the booking or detaining of people showing signs of intoxication after arrest.

58. As a result, on information and belief, at all relevant times, BPD did not require its officers to seek a medical evaluation, obtain outside medical treatment, or provide medical care themselves for people held in custody after arrest who showed signs and symptoms of opioid intoxication or overdose.

59. Given the location of the District 4 station, the frequency with which officers at the District 4 station arrest and detain intoxicated people, and the prior incidents of overdoses at the District 4 station, this policy, practice, and custom was objectively unreasonable, and deliberately indifferent, to a serious medical need.

60. The BPD's policy, practice, and custom of failing to train its officers to recognize and respond to opioid intoxication or overdose in detainees after arrest was also the moving force behind the violations of Cristhian's constitutional rights by the Defendant.

61. Between the hours of 6:00 PM and 6:30 PM on May 27, 2019, Cristhian repeatedly ingested drugs in his cell. Cristhian's conduct should have been clearly visible on BPD's surveillance video and from the hallway immediately outside his cell.

62. Minutes later, Cristhian experienced what appeared to be a seizure, as his body shaking and his limbs flailing uncontrollably. This was clearly visible on BPD's surveillance video. Cristhian then became motionless on the bench in his cell, and for the next thirteen minutes, visibly struggled to breathe.

63. According to the BPD's investigation, Christian took his last breath at approximately 6:40 P.M.

64. Over the next four and a half hours, an officer walked by Cristhian's cell a total of nineteen times, looking into his cell on five of those occasions. Each of those five times Christian remained in the exact same position: face down on the cell bench.

65. Between 11:30 PM on May 27, 2019, and 12:15 AM on May 28, 2019, officers walked by Cristhian's cell four times.

66. Between the hours of 12:29 AM and 4:00 AM, Officer Ismael Almeida—the same officer who booked Cristhian and walked by his cell throughout the night of his arrest—was assigned to the booking desk at the District 4 station. Officer Almeida walked by Cristhian's cell a total of fourteen times during these hours as Cristhian remained in the exact same position, but he never looked in.

67. At approximately 4:00 AM, an alarm rang and the Boston Fire Department arrived. Officer Almeida and another officer walked by Cristhian's cell during this time. If either officer had glanced in, they would have noticed that, despite the commotion, Christian had not changed his position.

68. At approximately 5:00 AM, an officer placed Cristhian's breakfast in his cell. At 6:22 AM, that same officer walked by Cristhian's cell and looked inside. It had been nearly eleven hours since Cristhian had eaten dinner, and the officer noted that Cristhian had not touched his breakfast. Despite this observation, the officer did not enter Cristhian's cell, attempt to rouse him, or seek medical assistance.

69. Instead, the BPD only discovered that Cristhian had died when, fourteen hours after he took his last breath, Officer Kevin Butcher attempted to wake him for a scheduled court hearing. At

that time, Officer Butcher discovered that Christian was stiff and not moving. When EMS arrived, resuscitation was not attempted due to "obvious signs of death."

70. Instead, the BPD deliberately, unreasonably, and unconstitutionally continued to implement an inadequate training program for their employees that was the moving force in Cristhian's death.

71. Finally, the BPD's policy, practice, and custom of failing to supervise, investigate, and discipline BPD officers who violated the rights of people living with OUD to receive reasonable and adequate medical care while in custody was also the moving force behind the violations of Cristhian's constitutional rights by the Defendant Officers.

**CLAIMS FOR RELIEF**

**Count I – Unconstitutional Failure to Provide Medical Care, Treatment, and Monitoring in Violation of the Fourteenth Amendment's Right to Due Process (42 U.S.C. § 1983)**
(against all Defendants)

72. Plaintiff incorporates by reference the foregoing paragraphs as if set forth here in their entirety.

73. Defendant Officers Almeida and John/Jane Doe Nos. 1–2, and the BPD are persons within the meaning of 42 U.S.C. § 1983.

74. On May 27-28, 2019, Cristhian Geigel was held in custody by Defendant BPD, specifically subject to the custody and control of Defendant Officers Almeida and John/Jane Doe Nos. 1–2.

75. On May 27-28, 2019, Defendant Officers Almeida and John/Jane Doe Nos. 1–2 were aware of Cristhian's serious medical needs, and deliberately and unreasonably failed to seek a medical evaluation, obtain outside medical treatment, or provide him with medical care themselves. This

failure was pursuant to the policies, practices, and customs of the BPD as described above, including but not limited to its written rules and procedures, and its failure to train, supervise, investigate and discipline its officers.

76. Defendants' refusal to seek a medical evaluation, obtain outside medical treatment, or provide Cristhian with medical care themselves caused Cristhian to die.

77. Defendants' actions deprived Cristhian of his rights, privileges, or immunities secured by the U.S. Constitution and laws, including his clearly established due process rights under the Fourteenth Amendment to the U.S. Constitution, in violation of 42 U.S.C. § 1983.

78. Defendants' actions were taken with reckless disregard for Cristhian's constitutional rights.

79. As a result of Defendants' actions, Cristhian and his next of kin lost his reasonably expected income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice. Cristhian died because of Defendants' actions. As a result, his grieving children lost their only father.

### Count II – Violation of Title II of the Americans with Disabilities Act (ADA)
(against Defendant BPD)

80. Plaintiff incorporates by reference the foregoing paragraphs as if set forth here in their entirety.

81. Defendant BPD is a public entity subject to the ADA.

82. Drug and alcohol addiction is a "disability" under the ADA. See 42 U.S.C. §§ 12102 and 12131(2); 28 C.F.R. § 35.108 (The phrase "physical or mental impairment includes, but is not limited to . . . drug addiction.").

83. Cristhian Geigel was subject to the custody and control of Defendant BPD for approximately a day and half until he was declared dead on May 28, 2019.

84. Throughout his time in Defendant BPD's custody, Cristhian was a qualified person with a disability, including because he had a physical or mental impairment that substantially limited one or more major life activities, and because the BPD regarded him as having a mental or physical impairment within the meaning of the ADA.

85. Defendant BPD intentionally and unreasonably discriminated against Cristhian on account of his OUD by failing to implement policies and train its officers in methods that would have provided Cristhian with an adequate medical evaluation, monitoring, care, and treatment.

86. Defendant BPD intentionally and unreasonably discriminated against Cristhian on account of his OUD because its policies and training treated OUD-related medical needs differently from other kinds of medical needs.

87. Defendant Officers intentionally and unreasonably discriminated against Cristhian on account of his OUD by failing to obtain an adequate medical evaluation, seek outside medical treatment or provide medical care themselves despite his clear signs of urgent medical distress.

88. Because of Cristhian's disability, Defendant BPD and Defendant Officers intentionally discriminated against Cristhian, failed to provide him with adequate treatment for his medical conditions, deprived him of the benefits of its medical program, and were objectively unreasonable towards, and deliberately indifferent to, his serious medical needs.

89. Defendant BPD's unlawful discrimination against Cristhian caused his death.

90. Separately, Defendant BPD is vicariously liable for the Defendant Officers unlawful discrimination against Cristhian.

91. As a result of Defendant's actions, Cristhian and his next of kin lost his reasonably expected income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice. Cristhian died because of Defendant's actions. As a result, his grieving family lost their father and son.

**COUNT III – Wrongful Death (Mass. Gen. Laws ch. 229, § 2)**
(against Defendant Officers Ismael Almeida and John/Jane Doe Nos. 1–2)

92. Plaintiff incorporates by reference the foregoing paragraphs as if set forth here in their entirety.

93. Defendant Officers caused Cristhian Geigel's death by intentional acts.

94. Cristhian's next of kin, by and through the Estate, is entitled to compensation for the loss of Cristhian's reasonably expected income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice.

**JURY DEMAND**

Plaintiff requests a trial by jury for all claims.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that the Court:

    1. Award Plaintiff compensatory damages and statutory interest;

    2. Award Plaintiff punitive damages;

    3. Award Plaintiff attorneys' fees and costs; and

    4. Grant such other and further relief as the Court deems just and proper.

September 7, 2022                                    Respectfully submitted,

                                                                       _____/s/ John Benzan\_\_\_\_\_
                                                                       John Benzan BBO #555874

Law Office of John Benzan
P.O. Box 620667
Newton Lower Falls, Massachusetts 02462
Tel.: (617) 733-7723
johnbenzan@msn.com